PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: COMPANIA NAVIERA JOANNA
SA, as OWNER; MSC
MEDITERRANEAN SHIPPING COMPANY
SA,

*Appellees,*

v.

KONINKLIJKE BOSKALIS
WESTMINSTER NV; BOSKALIS
INTERNATIONAL BV; WESTMINSTER
INTERNATIONAL BV,

*Claimants-Appellants.*

No. 08-1031

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
David C. Norton, District Judge.
(2:07-cv-01531)

Argued: March 24, 2009

Decided: June 26, 2009

Before NIEMEYER and SHEDD, Circuit Judges,
and Thomas D. SCHROEDER, United States District Judge
for the Middle District of North Carolina,
sitting by designation.

Affirmed as modified by published opinion. Judge Niemeyer
wrote the opinion, in which Judge Schroeder joined. Judge
Shedd wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Mary Campbell Broughton, FOWLER RODRI-GUEZ VALDES-FAULI, Mobile, Alabama, for Appellants. Gordon D. Schreck, BUIST, MOORE, SMYTHE, MCGEE, PA, Charleston, South Carolina; Douglas M. Muller, MOORE & VAN ALLEN, PLLC, Charleston, South Carolina, for Appellees. **ON BRIEF:** Antonio J. Rodriguez, Alanson T. Chenault, IV, FOWLER & RODRIGUEZ, New Orleans, Louisiana; Paul F. Tecklenburg, TECKLENBURG LAW FIRM, LLC, Charleston, South Carolina, for Appellants. Adriane M. Belton, BUIST, MOORE, SMYTHE, MCGEE, PA, Charleston, South Carolina, for Appellee MSC Mediterranean Shipping Company SA.

---

**OPINION**

NIEMEYER, Circuit Judge:

During daylight hours on March 8, 2007, a large 107,849-ton containership, the *MSC Joanna*, owned by a Panamanian corporation and chartered by a Swiss corporation, collided with a 33,423-ton dredge, owned and chartered by Netherlands corporations, in Chinese territorial waters near the port of Tianjin, causing serious damage to both vessels. After Chinese authorities investigated the collision and legal proceedings began, with the arrest of both vessels, in the Tianjin Admiralty Court to resolve liability and damages, the Netherlands corporations commenced eight different actions in four separate district courts in the United States under Admiralty Rule B to resolve liability and damages issues under U.S. law. The owner and charterer of the containership commenced this limitation-of-liability action under Admiralty Rule F as a defensive strategy to enjoin the eight actions filed against them and then to have this action dismissed in favor of the Chinese proceedings under the doctrine of *forum non conveniens*.

The district court enjoined the U.S. actions and granted the motion to dismiss this action, even though the dredge owner and charterer may now be beyond the deadline for pursuing claims in the Tianjin Admiralty Court. The district court found that "the United States has absolutely no connection to the events giving rise to this action" and the dredge owner and charterer should not be allowed to proceed in U.S. courts. With respect to whether claims might now be barred in the Chinese court, the district court found that the dredge owner and charterer deliberately let the deadlines in the Chinese court pass, and it stated that "[a] party should not be allowed to assert the unavailability of an alternative forum when the unavailability is a product of its own purposeful conduct" in letting the deadline pass.

Even though the multiplicity of proceedings introduce complexity into this case and equities favor each side, we conclude that the district court did not, in the particular circumstances of this case, abuse its discretion in applying the doctrine of *forum non conveniens* and dismissing this action. Accordingly, we affirm, but with the modification that any applicable statute of limitations or defense based on a missed deadline may not be affirmatively asserted in the Chinese proceedings.

I

On March 8, 2007, while the world's largest dredge, the *W.D. Fairway* (approximately 770 feet long), was dredging the shipping channel leading through the Bohai Gulf to the port of Tianjin, China, it was hit broadside by a large containership (approximately 1,100 feet long), the *MSC Joanna*, which was departing from the port—or, the *W.D. Fairway* crossed the bow of the *MSC Joanna* causing the collision with the containership, depending on whose version of the facts is accepted. Both vessels suffered severe damage, but the hull of the dredge was breached, and the dredge sank to the bottom in shallow water. Both vessels, however, were salvaged and

temporarily repaired in Chinese shipyards. The owner and charterer of the dredge now claim that their vessel sustained $326 million in damages, and the owner and charterer of the containership claim that their vessel sustained $10.5 million in damages.

The dredge is owned by Westminster International BV, a Netherlands corporation, and is chartered to Boskalis International BV, a related Netherlands corporation. Both corporations receive services from their common grandparent, Koninklijke Boskalis Westminster NV, a Netherlands corporation. These three corporations (hereafter "Boskalis") are part of the Boskalis group, headquartered in Papendrecht, The Netherlands. Boskalis subchartered the dredge in January 2007 to CCCC Tianjin Dredging Company, Ltd., a Chinese dredging firm, and at the time of the collision, the dredge was manned by a Chinese crew and was reflagged with the Chinese flag.

The containership, the *MSC Joanna*, is owned by Compania Naviera Joanna SA, a Panamanian corporation, and is chartered to MSC Mediterranean Shipping Company SA, a Swiss corporation and the second largest container-shipping company in the world. The *MSC Joanna*, which frequented ports in the Far East, was manned by a crew of Italian, Croatian, Indonesian, Polish, and "Yugoslav" nationals and was flying the Panamanian flag.

The collision occurred in Chinese territorial waters, which are under the jurisdiction of the Tianjin division of the Maritime Safety Administration, an entity "similar to the United States Coast Guard." The Tianjin Maritime Safety Administration conducted an investigation of the collision, interviewing witnesses, making diagrams, and retaining documents. Shortly after the collision, both the Boskalis entities and MSC Mediterranean Shipping filed petitions with the Tianjin Admiralty Court to obtain evidence-preservation orders, and the court granted the petitions.

About a week after the collision, the Chinese subcharterer of the dredge filed a claim in the Tianjin Admiralty Court for $19.5 million in damages, and in connection with that claim, it obtained an order arresting the *MSC Joanna*. Then on April 4, 2007, MSC Mediterranean Shipping and Compania Navi-era Joanna (collectively "MSC Shipping") commenced two actions in the Tianjin Admiralty Court—a limitation-of-liability action and a claim for damages against Boskalis and the Chinese subcharterer in the amount of $10.5 million. In the limitation-of-liability action, MSC Shipping deposited approximately $20 million with the Tianjin Admiralty Court as the properly calculated limitation fund, and the Court accepted the fund and directed all claimants to file claims for any damages arising out of the collision against the fund by June 30, 2007. The amount of the fund was determined by the tonnage-formula method used by Chinese courts, as well as by the majority of maritime nations (but not by the United States).

MSC Shipping's damages complaint was served on West-minster International and Boskalis International, the owner and charterer of the dredge, and MSC Shipping obtained an order arresting the dredge, the *W.D. Fairway*. Those two Bos-kalis companies challenged the Chinese court's jurisdiction over them, and thereafter decided to proceed no further in the Tianjin Admiralty Court. As counsel for Boskalis advised the district court in this case:

> All of the Boskalis entities have made the decision that they do not desire to participate in China because they've all—those that have been served have filed objections to the jurisdiction of the Chi-nese court, which has not been—those objections have not been heard in China at this time.

At oral argument, however, counsel for Boskalis advised us that the Chinese court had rejected their jurisdictional chal-lenge. The record does not reveal whether Boskalis has taken

any further steps in the damages action filed against it by MSC Shipping in China.

Boskalis also made the decision not to file a claim against the limitation fund in the Tianjin Admiralty Court, even though it knew of the Chinese court's admonition that claims had to be filed by June 30, 2007. As counsel for Boskalis acknowledged to the district court:

> The Court:   Okay. So the Boskalis entities made a reasoned decision after being notified that there was a limitation of liability proceeding instituted in the courts of China not to participate and let the statute of limitations run?

> Counsel for Boskalis:    That's correct, Your Honor.

Instead of proceeding in the Tianjin Admiralty Court, Boskalis sought to litigate its claims for damages against MSC Shipping in the United States. It acknowledges that it made this election because U.S. law would, according to its assessment, result in a larger limitation fund than the fund created under Chinese law. On May 4, 2007, it commenced an action against MSC Shipping for $326 million in damages in the Southern District of Texas. Because MSC Shipping was not found in that district, Boskalis proceeded under Admiralty Rule B and attached an unrelated vessel chartered by MSC Shipping, requiring MSC Shipping to file security for the release of that vessel. Rule B is designed to secure the appearance of the defendant and, through the attachment of defendant's assets, secure satisfaction of any judgment entered, up to the value of the assets. *See Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 693 (1950). Because the amount filed by MSC Shipping to obtain release of its vessel was insufficient to pay Boskalis' $326-million damage claim, Boskalis filed seven additional Rule B claims in district courts in Texas, Louisiana, South Carolina,

and Virginia, obtaining a total of 16 orders of attachment under Rule B to be executed against vessels chartered by MSC Shipping.

To avoid the continued attachment of its ships in the United States, MSC Shipping filed this limitation action pursuant to Admiralty Rule F and posted security of $111,348,810, based on the value of the *MSC Joanna* after the collision and pending freight, as required by United States law for calculating limitation liability. *See* 46 U.S.C. § 30505. Although MSC Shipping created a limitation fund, it asserted that its purpose in filing this action was to enjoin the eight actions filed by Boskalis and then to have this limitation action dismissed, contending that no court in the United States was a convenient forum to resolve the issues arising from the collision in China. MSC Shipping stated in its complaint:

> 20. Plaintiffs have initiated this proceeding as the result of Boskalis' filing of eight actions in four different U.S. District Courts seeking sixteen writs of attachment. Plaintiffs specifically reserve the right to assert the legal doctrine of *forum non conveniens* in this proceeding, and to file a motion to dismiss this proceeding on those grounds.

> 21. Plaintiffs also specifically reserve the right to assert that foreign law applies both to the determination of liabilities arising out of the Collision, and to all issues arising in connection with this limitation proceeding, said applicable law being that of the People's Republic of China.

After the district court enjoined Boskalis from proceeding in the other actions, MSC Shipping filed a motion to dismiss this action in favor of the proceedings in the Tianjin Admiralty Court, based on the doctrine of *forum non conveniens*. The district court granted the motion, even though Boskalis claimed that it could not prosecute its claim in the Tianjin

Admiralty Court because it had let pass the time for filing claims there—a question of foreign law on which the parties disagree. The district court recognized that the doctrine of *forum non conveniens* presumes that an adequate alternative forum is available, but it also concluded that Boskalis could not assert the unavailability of an alternative forum when the unavailability was the product of Boskalis' own purposeful conduct. As the court observed:

> The Chinese maritime court established a June 30, 2007, deadline for filing claims in the limitation action. At the hearing, claimants' counsel acknowledged that they deliberately chose "not to participate in China." Thus, the only reason the Chinese forum is not available in this case is because claimants knowingly and purposefully opted to miss the deadline for filing their claims in that forum.

(Citations and footnote omitted). The court then addressed the inappropriateness of a United States court adjudicating Boskalis' claims, describing the lack of any nexus between the disputes and the United States. It stated:

> The United States has absolutely no connection to the events giving rise to this action. None of the parties is a United States entity or citizen. Neither vessel was registered in the United States. Neither vessel ever darkened the doorstep of a United States port. No member of either crew was a United States citizen. No United States citizens are fact witnesses. Most, if not all, of the potential witnesses speak a language other than English, requiring a plethora of translators if the case were retained by this court.
>
> * * *
>
> [And] [t]he most compelling public interest factor favoring dismissal may be the challenge of applying foreign law.

The court found that the only connection that Boskalis' claims have with the United States is "incredibly minor," *i.e.*, that "*other* vessels chartered by Mediterranean Shipping Co. regularly call on United States ports."

From the district court's order, dated November 2, 2007, dismissing this action under the doctrine of *forum non conveniens*, Boskalis appealed. On appeal, it contends (1) that the district court improperly allowed MSC Shipping to dismiss its own limitation of liability proceedings on the ground of *forum non conveniens*; (2) that the court erred in dismissing the action without finding that China was an available and adequate forum; and (3) that the court erred because no conditions were imposed "to maintain Boskalis' rights" in the Chinese courts such as having MSC Shipping not assert any limitation defenses in China.

II

Boskalis' principal argument, which is procedural in nature, rests on its assertion that MSC Shipping cannot invoke the benefits of the limitation procedure in Admiralty Rule F and then have its own action dismissed for *forum non conveniens*. As Boskalis summarizes the argument:

> [T]here is no basis for a party to avail itself of the extraordinary benefits of a limitation of liability action in the U.S., and then for that party to seek *forum non conveniens* dismissal of its own action— soon after the deadline for filing claims has passed in its parallel limitation action filed in China. The benefits of limitation . . . are only available in return for the owner appearing and agreeing to pay claims up to the amount of the limitation fund. What MSC sought by filing the South Carolina action was not to limit its liability according to the U.S. Limitation of Liability Act, but to avoid liability for this collision,

which clearly was its fault, through misapplication of the doctrine of *forum non conveniens*.

MSC Shipping argues that it has a right to bring this limitation action as a defensive mechanism, employing this action as the vehicle for enjoining the United States cases and adjudicating the proper place to litigate the disputes over the collision that took place in China. It contends that Boskalis has advanced no authority to suggest that MSC Shipping used the limitation procedure improperly and that, to the contrary, case law supports its use of the limitation procedure as a "purely necessary defensive action," citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 20 (1972), and *In re Geophysical Service, Inc.*, 590 F. Supp. 1346, 1358-61 (S.D. Tex. 1984).

The procedural issues raised by the parties are indeed complex and novel. But we resolve them by considering all of the proceedings filed to resolve the issues over liability and damages for the collision and by applying to the aggregate proceedings original principles related to limitations of liability, the *forum non conveniens* doctrine, and public policy.

Multiple actions relating to the collision were filed first in China. Following the collision on March 8, 2007, MSC Shipping filed (1) a limitation-of-liability action by which it notified all claimants against the *MSC Joanna* to file their claims against the limitation fund; and (2) a damages action against Boskalis for the damages that the *W.D. Fairway* allegedly caused to the *MSC Joanna*. These actions were commenced in the Tianjin Admiralty Court, which has jurisdiction over both vessels, having arrested both, and jurisdiction over all parties, including the Chinese subcharterer and the Chinese marine pilots of the ships. No party has questioned the capacity of the Tianjin Admiralty Court to adjudicate fairly and completely all of the issues.

In an effort to force MSC Shipping to take advantage of the U.S. Limitation of Liability Act, which in the circumstances

of this case would probably result in a more favorable outcome to Boskalis, Boskalis began filing damage claims in the United States against MSC Shipping, demanding in each $326 million in damages. Because MSC Shipping could not be found in the United States, Boskalis employed Admiralty Rule B and attached other, unrelated ships chartered by MSC Shipping that were calling on U.S. ports. It filed eight separate actions in Texas, Louisiana, South Carolina, and Virginia and obtained 16 writs of attachment directed against ships chartered by MSC Shipping. When one of the writs was successfully executed in Texas, MSC Shipping filed a bond to obtain the release of the ship. In response to Boskalis' actions and to avoid further attachments of its ships, MSC Shipping commenced this action to enjoin all of Boskalis' actions in favor of one action and then to have it dismissed under the doctrine of *forum non conveniens*. In commencing this action, MSC Shipping announced its purpose to challenge in one action all of Boskalis' actions in the United States under the doctrine of *forum non conveniens*, alleging that the appropriate forum for litigating the disputes arising from the collision was in China.

The policy considerations favoring MSC Shipping's strategy center on the policies underlying the doctrine of *forum non conveniens*. MSC Shipping contends that the Chinese courts arrested the *MSC Joanna*, as well as the *W.D. Fairway*, and that a fund of $20 million, computed in accordance with Chinese and international law, is on deposit in the Tianjin Admiralty Court, allowing claims to be made against the fund. It also notes that the liability for the collision will be similarly decided in the damages action it commenced against Boskalis in China, which is also still pending there. In support of its position, MSC Shipping points out that the collision was investigated by Chinese officials, who boarded both vessels, conducted interviews, and collected documentation, and that most of the witnesses would be in China, as the entire crew of the *W.D. Fairway* was Chinese and the marine pilot navigating the *MSC Joanna* through the channel at the time of the

collision was Chinese. It notes that neither of the ships has ever called on a U.S. port and neither was manned by even a single U.S. citizen. The owners and charterers of the ships involved are non-U.S. corporations—from Panama, Switzerland, and The Netherlands—and, under conflict of laws rules applicable to the collision, Chinese law will be applicable to resolve the disputes.

Boskalis' principal, if not only, strategic concern with litigating the dispute in China is that the limitation fund created in China is only $20 million, and its claim for damages amounts to $326 million. A limitation fund created in the United States would be much larger—equal to the post-collision value of the vessel and pending freight. *See* 46 U.S.C. § 30505. In this case, the *MSC Joanna* was a large containership that was damaged in the collision to a relatively minor extent, leaving a post-collision value, including pending freight, of more than $111 million. Accordingly, Boskalis is seeking to take advantage of the U.S. limitation-of-liability law, and if it cannot succeed, it is willing to waive participation in the Chinese proceedings, having anticipated that it would receive little or no recovery from them. Put bluntly, Boskalis has gambled on the possibility that the U.S. courts might allow it to proceed in the United States to resolve the claims between it and MSC Shipping and accepted the risk that it will obtain no recovery at all from either a U.S. court or a Chinese court.

The Limitation of Liability Act, 46 U.S.C. § 30501 *et seq*., has its origins in the maritime law of modern Europe and was adopted by Congress in 1851, having been patterned on its European counterparts. The Act limits a shipowner's and charterer's liability for claims arising from "any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner [or charterer]" to the "value of

the vessel and pending freight." 46 U.S.C. § 30505. Limiting the owner's liability to the value of his interest in the vessel and pending freight was intended to place investors in sea-shipping and navigation on equal footing with corporate investors in land-based enterprises.

> The great object of the law was to encourage ship-building and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. Those who are willing to manage and work ships are generally unable to build and fit them. They have plenty of hardiness and personal daring and enterprise, but they have little capital. On the other hand, those who have capital, and invest it in ships, incur a very large risk in exposing their property to the hazards of the sea, and to the management of seafaring men, without making them liable for additional losses and damage to an indefinite amount. How many enterprises in mining, manufacturing, and internal improvements would be utterly impracticable if capitalists were not encouraged to invest in them through corporate institutions by which they are exempt from personal liability, or from liability except to a limited extent? The public interests require the investment of capital in ship-building, quite as much as in any of these enterprises.

*Norwich Co. v. Wright*, 80 U.S. 104, 121 (1871); *see also Black Diamond S.S. Corp. v. Robert Stewart & Sons, Ltd.*, 336 U.S. 386, 399 (1949) (Jackson, J., dissenting) (observing that the Limitation of Liability Act was "designed to encourage American capital to risk itself in shipping ventures where ships are but boards, sailors but men: . . . and then there is the peril of waters, winds, and rocks. In order that disaster at sea might not jeopardize the shipowner's other assets, Congress limited his liability . . . . This limitation serves much the same

purpose for maritime ventures that the corporate fiction serves for the landsman's enterprises" (internal quotation marks and footnote omitted)).

Thus, upon receipt of a claim arising from damage at sea or a shipwreck, the owner or charterer of the vessel may commence an action under the Limitation of Liability Act by depositing a fund with the court for the benefit of all claimants equal to the value of the owner's interest in the vessel and pending freight at the end of the voyage or following any wreck. As in an analogous interpleader action or bankruptcy proceeding, the limitation of liability provisions authorize the court to enjoin all prosecutions of claims with respect to the matter other than claims against the fund. Thus, an owner or charterer may avoid a multiplicity of actions against it; resolve the issues raised in the multiplicity of actions in a single action; and limit its liability in the one action to the value of the vessel and pending freight. *See generally* 46 U.S.C. § 30511; Fed. R. Civ. P. Admiralty Rule F.

Complying with the requirements of the Limitation of Liability Act and Admiralty Rule F, MSC Shipping commenced this action against Boskalis by depositing with the court $111,348,810, the value of the *MSC Joanna* and pending freight. But its purpose in filing this action was not to have claims arising from the collision in China paid from the limitation fund but rather to protect itself from the multiplicity of actions filed by Boskalis against it *in the United States* relating to the collision. Boskalis contends that this use of the limitation-of-liability process amounted to a misuse and that the district court erroneously countenanced it by enjoining Boskalis' U.S. actions in favor of this action and then dismissing this action in favor of the Chinese proceedings under the doctrine of *forum non conveniens*.

In employing Admiralty Rule F in effect to collect all the actions filed in the United States into one action and have that one action serve as the forum for resolving MSC Shipping's

*forum non conveniens* challenge to any U.S. litigation, MSC Shipping surely did not fulfill the full purpose of the Limitation of Liability Act, which includes the adjudication of claims against the fund. But it did take advantage of one purpose of the Act, that of enjoining multiple actions in favor of one action to resolve the disputes. Because the threshold question is where trials relating to the collision should take place, it never intended to have the fund used to pay claims. Nonetheless, it did create the fund in the U.S. court as required, and if it loses its *forum non conveniens* challenge, it will be required to litigate the claims in this case. MSC Shipping is thus gambling, just as Boskalis has gambled. But as with any gamble, the bettor must accept the risk of losing.

While there is a certain inconsistency in MSC Shipping's actions when considered within the "four corners" of a limitation-of-liability action, in the larger context, MSC Shipping was simply seeking to collect all of the cases in the United States relating to the Chinese collision and have them subjected to the test for determining whether they should be dismissed under the *forum non conveniens* doctrine. It announced its purpose for doing so at the outset. The alternative would have been for MSC Shipping to follow Boskalis around the country, as it filed each lawsuit seeking to attach assets of MSC Shipping, and, within each action, to make its *forum non conveniens* motion. Judicial efficiency for both parties, however, favors the course selected by MSC Shipping. The superficial inconsistency of filing an action and then seeking its dismissal does not in this context become intolerably inconsistent. The Supreme Court has specifically rejected the argument that the party initiating the limitation proceeding cannot then seek to have it dismissed. *See M/S Bremen*, 407 U.S. at 2, 19-20 (involving a circumstance where the party that initiated a limitations action then sought to dismiss it based on a contractual forum selection clause).

In the peculiar circumstances of this case, we conclude that MSC Shipping did not abuse the U.S. limitation of liability

procedure; it complied with its requirements and was prepared to accept its outcome. Moreover, the fact that it filed a motion challenging all U.S. litigation under the *forum non conveniens* doctrine in the limitation of liability action that it filed was not an abuse of the process. If one accepts the conclusion that a foreign corporation's preference for U.S. law in resolving a dispute arising outside of the United States cannot alone serve as a valid basis for resolving the dispute in the United States, then MSC Shipping's course of proceeding in this case was the most efficient for both parties. Thus, just as the Supreme Court in *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422, 435-36 (2007), deferred to the Guangzhou Admiralty Court in China, we defer to the Tianjin Admiralty Court in China.

Boskalis also contends that while *forum non conveniens* could properly be applied in the actions it filed in the various districts, the doctrine does not apply to limitation-of-liability actions. Although it has rational arguments to make on this point, it fails to account for the case law. In federal courts, the doctrine of *forum non conveniens* appears to have been "given its earliest and most frequent expression in admiralty cases." *American Dredging Co. v. Miller*, 510 U.S. 443, 449 (1994); *see also British Transp. Comm'n v. United States*, 354 U.S. 129, 135 (1957) (stating in the context of a claim for limitation of liability that "admiralty limitation [does not preclude] other ordinary admiralty procedures. . . . [The rules] were not intended to restrict parties claiming the benefit of the law, but to aid them" (internal quotation marks omitted)); *Karim v. Finch Shipping Co.*, 265 F.3d 258, 268-71 (5th Cir. 2001) (applying the *forum non conveniens* factors in the context of a limitation-of-liability action); *In re Geophysical Serv.*, 590 F. Supp. at 1361 (dismissing a limitation action on *forum non conveniens* grounds).

In sum, MSC Shipping did not abuse the limitation-of-liability process and the district court did not err in considering a motion to dismiss filed in the limitation-of-liability

action on the ground of *forum non conveniens* when the limitation-of-liability action is part of a larger related complex of actions filed in the United States.

### III

Still, we are left with the question whether the criteria for applying the *forum non conveniens* doctrine in this case were met. On this issue, we will reverse the district court only when there has been "a clear abuse of discretion." *American Dredging*, 510 U.S. at 455 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981)). "[W]here the [district] court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Id.* (quoting *Piper Aircraft*, 454 U.S. at 257); *see also Kontoulas v. A.H. Robins Co.*, 745 F.2d 312, 314 (4th Cir. 1984).

The *forum non conveniens* doctrine is a common law doctrine now largely limited in federal court to cases where the alternative forum for litigating the dispute is outside of the United States. *See, e.g.*, *Sinochem Int'l*, 549 U.S. at 435-36 (applying the doctrine in favor of the Guangzhou Admiralty Court in China). Under the doctrine, a court may dismiss an action in favor of an alternative forum when "the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or when the chosen forum [is] inappropriate because of considerations affecting the court's own administration and legal problems." *American Dredging*, 510 U.S. at 447-48 (alteration in original) (quoting *Piper Aircraft*, 454 U.S. at 241) (internal quotation marks omitted).

Granting a motion to dismiss for *forum non conveniens* rests in the discretion of the district court exercised upon consideration of numerous relevant factors, including (1) the ease of access to sources of proof; (2) the availability of compulsory process for securing the attendance of unwilling wit-

nesses; (3) the costs of obtaining the attendance of witnesses; (4) the ability to view premises; (5) the general facility and cost of trying the case in the selected forum; and (6) the public interest, including administrative difficulties, the local interest of having localized controversies decided at home, and the interest of trying cases where the substantive law applies. *See American Dredging*, 510 U.S. at 448 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947)).

Applying these factors, the district court made findings, based on undisputed evidence, that no nexus,—whether the parties, the witnesses, or the law—exists between the United States and the collision at issue. In the words of the district court, "[t]he United States has absolutely no connection to the events giving rise to this action." The prospect of having to interpret and apply Chinese law as it might pertain to liability and the need for the many interpreters for the various involved parties was further given as a reason supporting the district court's conclusion that the public interest weighed overwhelmingly toward dismissal. Accordingly, it exercised its discretion to dismiss this case under the doctrine of *forum non conveniens*.

In *Piper Aircraft*, the Supreme Court allowed the dismissal of a case, similar to that before us, based on the *forum non conveniens* doctrine. 454 U.S. at 261. The action there arose from an airplane accident in Scotland. The Court held that where "the plaintiff is not an American citizen or resident, and particularly when the foreign citizens seek to benefit from the more liberal tort rules provided for the protection of citizens and residents of the United States," dismissal is appropriate. 454 U.S. at 242. There the majority of witnesses and complainants, as well as the debris from the accident, were located in Scotland. Even though some of the defendants were Americans, the Supreme Court held that that fact was insufficient to render the district court's dismissal order inappropriate. *Id.* at 260-61.

In this case, the facts weigh even more clearly in favor of dismissal. The collision occurred in Chinese territorial waters and was investigated by Chinese officials. Both ships were arrested in China in furtherance of damage claims filed there. The parties are foreign corporations—from Panama, Switzerland, and The Netherlands—and neither ship had any American national on board. All of the evidence is located in China or some other foreign jurisdiction. And attempting to secure the attendance of witnesses, procure relevant documents and other evidence, and provide translators for virtually every witness able to attend would administratively tax the court system, as would the effort at applying Chinese law.

These facts all weigh in favor of affirming the district court's ruling. Indeed none can be found to weigh in favor of trying this case in the United States. Boskalis can hardly maintain that its wish to apply U.S. limitation law is a sufficient reason to justify trying the case in the United States. *See Piper Aircraft*, 454 U.S. at 254-55. Thus, we conclude that the district court did not abuse its discretion in ordering dismissal of this action.

IV

Boskalis contends that the Tianjin Admiralty Court is not an *available and adequate* alternative forum and that therefore the district court erred as a matter of law in dismissing this action in favor of that forum under the doctrine of *forum non conveniens*. It asserts:

> The district court committed an error of law by dismissing MSC's limitation proceeding in favor of an alternative forum that is neither available nor adequate. First, the court's attempt to create an exception to the availability requirement for fraud or bad faith is entirely without precedent in the doctrine of forum non conveniens. The doctrine of forum non

conveniens is well defined, and does not include any
such exception.

* * *

Even if such an exception did exist, it would be inap-
plicable here, as Boskalis did not act fraudulently or
with bad faith, and the court did not find that it did.
MSC commenced two limitations proceedings that
were simultaneously open for claims, providing Bos-
kalis with a choice of fora in which to proceed. Bos-
kalis simply chose to proceed in Charleston rather
than China. This decision was clearly not a product
of fraud or bad faith, and thus should not be subject
to the court's ill-founded exception to the availabil-
ity requirement of forum non conveniens.

It is true that the doctrine of *forum non conveniens* can be
applied only where another forum having jurisdiction is avail-
able at the time of the district court's decision to resolve the
dispute. *See Piper Aircraft*, 454 U.S. at 254 n.22; *Kontoulas*,
745 F.2d at 315. An alternative forum exists "when the defen-
dant is amenable to process in the other jurisdiction." *Piper
Aircraft*, 454 U.S. at 254 n.22 (internal quotation marks omit-
ted). We have held, however, that if the statute of limitations
has expired in the alternative forum, the forum is not avail-
able, and the motion to dismiss based on *forum non conve-
niens* would not be appropriate. *Kontoulas*, 745 F.2d at 316.
But a difference in the law in the two forums—even where
the amount of potential recovery is drastically different—is
not sufficient to bar application of the *forum non conveniens*
doctrine. *See Piper Aircraft*, 454 U.S. at 254-55 (noting that
unless plaintiffs would "be deprived of any remedy or treated
unfairly," the alternative forum would not be considered inad-
equate).

In this case, MSC Shipping proffered evidence on the avail-
ability of the Chinese forum by noting that the forum had

jurisdiction over the parties and over the vessels. With respect to whether a statute of limitations would bar a claim at the time the district court dismissed this action, MSC Shipping argued that Boskalis deliberately forfeited the availability of a forum on this basis by electing not to proceed in China and deliberately letting the time for filing claims in China pass. Boskalis nonetheless argues now that the time for filing had passed and that MSC Shipping cannot fulfill its burden of showing the availability of the Chinese forum.

In addition to showing that Boskalis deliberately forfeited the alternative forum, MSC Shipping also filed affidavits and copies of Chinese statutes to show that the statute of limitations had not in fact expired in China at the time it filed its motion to dismiss. It recognized that the notice issued by the Chinese court required that claims be filed in the limitation of liability action by June 30, 2007, but it provided interpretations issued by the Supreme People's Court of China that have noted that as long as the statute of limitations in a civil case is not raised as a defense, the court will not raise the issue *sua sponte*. Provisions of the Supreme People's Court on Several Issues Concerning the Application of Statutes of Limitation During the Trial of Civil Cases (promulgated by the Supreme People's Court, Aug. 21, 2008, effective Sept. 1, 2008), art. 3. MSC Shipping also showed that Chinese legal scholars have noted that China's system is not a strictly statutory system and that judges are given sufficient leeway to effectuate a just outcome. *See* Feng Jinwei & Zhang Decai, Statute of Limitations: Law and Realty, China L. & Prac., Dec. 2000-Jan. 2001 (stating that "judge(s) will usually take into consideration the facts of the particular case when deciding whether to strictly enforce the time limits . . . . They do not believe it is fair to decide against the rights holder simply because it has failed to exercise its rights in time" and noting that attempts at settlements or mediation will often be considered sufficient to satisfy the statute of limitations).

While it is thus not clear whether a statute of limitations would have indeed barred Boskalis' claim against the limita-

tion fund in China, the overriding fact in this case remains that Boskalis has *elected not to proceed in China*— presumably based on its assessment that it is unlikely to benefit substantially in doing so—and accordingly has *deliberately* allowed any deadline for filing claims there to pass. As counsel acknowledged candidly to the district court, Boskalis "made a reasoned decision after being notified that there was a limitation of liability proceeding instituted in the courts of China not to participate and let the statute of limitations run." And based on that acknowledgment, the district court found that Boskalis "knowingly and purposefully opted to miss the deadline for filing their claims in [China]" because Boskalis chose "not to participate in China." The district court therefore ruled that "[a] party should not be allowed to assert the unavailability of an alternative forum when the unavailability is a product of its own purposeful conduct."

We agree with the district court. In circumstances as these, a claimant should not be heard to complain that an available forum, having jurisdiction over the parties and over most of the witnesses, is not available. Boskalis, relying on its assessment that any recovery under Chinese law would be inadequate, made the considered decision to pass on the Chinese proceedings and try to invoke U.S. law, which it thought would be more favorable to it, yet recognizing that if it were unable to invoke U.S. law, it would be unable to proceed in China. In these circumstances, the district court properly found an exception to the requirement of the *forum non conveniens* doctrine that the alternative forum be available. *See also Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1248 n.10 (5th Cir. 1983) (stating that where "the plaintiff's plight is of his own making—for instance, if the alternative forum was no longer available at the time of dismissal as a result of the deliberate choice of an inconvenient forum—the court would be permitted to disregard this consideration and dismiss"); *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 706 (7th Cir. 2005) (remanding for further exploration the issue whether the actions that made Mexico an unavailable forum

were taken in good faith); *Castillo v. Shipping Corp. of India*, 606 F. Supp. 497, 504 (S.D.N.Y. 1985) ("It would be a strange world if a litigant could 'bootstrap' himself into a New York court by missing the statute of limitations in the proper forum").

Boskalis argues that in any event the remedy available in the Tianjin Admiralty Court is inadequate because the limitation fund in China is only $20 million whereas the limitation fund in the United States is $111 million. Because its claim is for $326 million and the Chinese subcharterer has already filed a claim for $19.5 million, Boskalis claims that the compensation it could expect to receive from proceeding in the Chinese court would be inadequate.

The difference in the size of the limitation funds in China and in the United States results from different methods of computation. The amount of the Chinese limitation fund was determined by the internationally accepted tonnage-formula method by which the offending ship—alleged by Boskalis in this case to be the *MSC Joanna*—is valued by assigning a specific value per ton of the vessel's *pre-voyage* tonnage, irrespective of the damage sustained by the vessel in the collision. Maritime Code of the People's Republic of China (promulgated by Order No. 64 of the President of the People's Republic of China, Nov. 7, 1992, effective July 1, 1993), art. 204-15. This method of computing the limitation fund is the international norm for establishing limitation of liability funds. *See Limitation of Shipowners' Liability—The Brussels Convention of 1957*, 68 Yale L.J. 1676, 1699 (1959) (stating that the tonnage formula is the "mechanism most acceptable to a maximum number of nations"); *see also* Convention on Limitation of Liability for Maritime Claims (LLMC), Nov. 19, 1976, 16 I.L.M. 606; Protocol of 1996, May 3, 1996, 35 I.L.M. 1433. Thus, under the international norm for establishing limitation of liability funds, the value of the fund does not depend on the value of the ship surviving the wreck.

On the other hand, under United States law, the limitation fund is determined by calculating the value of the vessel and pending freight *at the end of the voyage or after the wreck*. Thus, if a ship sinks with only a life preserver salvaged, the limitation fund would consist of the value of the life preserver. On the other hand, if the ship survives the wreck substantially intact, as did the *MSC Joanna*, the fund would value the entire ship, albeit lessened by the damage value of $10.5 million. *See* Fed. R. Civ. P. Admiralty Rule F(2); *see also* Ruth L. Rickard, Comment, *A New Role for Interest Analysis in Admiralty Limitation of Liability Conflicts*, 21 Tex. Int'l L.J. 495, 498-99 (1986) (explaining the United States' system of post-voyage/wreck valuation).

At bottom, depending on the circumstances, the Chinese valuation method could be more favorable than the United States if the ship had sunk whereas the United States valuation method would be more favorable if the ship were mostly salvaged. Indeed, the United States method has been criticized for this very reason. *See* Rickard, 21 Tex. Int'l L.J. at 499 ("[The United States'] system of post-voyage valuation creates anomalous results. The highest possible fund is created in minor accidents that leave the ship seaworthy . . . . By contrast, the lowest possible fund is created in major disasters, cases that leave a sunken ship and perhaps a few lifeboats").

This difference in the method of calculating the limitation funds indicates, in the circumstances of this case, that the U.S. forum would be more favorable to Boskalis than would be a Chinese forum. Indeed Boskalis argues that because of the Chinese subcharterer's claim, the Chinese priority laws would result in a recovery in China of less than a million dollars. MSC Shipping vigorously disputes this interpretation of Chinese law, arguing that Boskalis might be entitled to a much higher percentage of the Chinese fund. But we need not, and surely should not, speculate on how Chinese courts might resolve the claims against the limitation fund there. The Supreme Court has made clear that appeals courts are not "to

compare the rights, remedies, and procedures available under the law that would be applied in each forum" to determine whether "the law applied by the alternative forum is as favorable to the plaintiff as that of the chosen forum." *Piper Aircraft*, 454 U.S. at 251. To do so would defeat the intended purpose of the *forum non conveniens* doctrine which "is designed in part to help courts *avoid* conducting complex exercises in comparative law." *Id.* (emphasis added). What we can conclude is that the Chinese forum offers a remedy and process for resolving the dispute—which happens to comport with the international norm for doing so—and thus we should not conduct a "complex exercise[ ] in comparative law" to determine the exact difference Boskalis may be entitled to between the different limitation funds. As the Supreme Court has said, to do otherwise "would increase and further congest already crowded courts" and result in adjudication of cases, "even though none of the parties are American, and even though there is absolutely no nexus between the subject matter of the litigation and the United States," simply because of an unfavorable change in the law. *Id.* at 252, 252 n.17.

"Of course, if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight." *Id.* at 254. In the circumstances presented in *Piper Aircraft*, the Supreme Court noted that even though Scottish law did not afford recovery to the plaintiffs based on strict liability, as did U.S. law, and even though the damages might be smaller, these differences did not indicate that a Scottish forum was an inadequate forum. An inadequate forum based on substantive law arises "where the alternative forum does not permit litigation of the subject matter of the dispute." *Id.* at 254 n.22. The Court summarized that a district court may reject an alternative forum as inadequate based on a difference in law *when the claimant "will be deprived of any remedy or treated unfairly*." *Id.* at 255 (emphasis added).

In this case, the Chinese forum provides a remedy, and moreover one that is completely analogous to the remedy pro-

vided by a U.S. forum *i.e.* affording the trial of claims made against a limitation fund—albeit computing the limitation fund through a different, but not necessarily less adequate method. If Boskalis were to succeed on its argument that the difference in the method of computing a limitation fund is an appropriate basis for finding inadequacy, it would have to conclude likewise that an admiralty court in The Netherlands, where it is based, and in most other seafaring nations would also not be adequate forums, inasmuch as The Netherlands maritime law, as well as the law of most other seafaring nations, applies the same method of computing the limitation fund as does the Chinese maritime law. *See* LLMC, 16 I.L.M. 606 (The Netherlands as signatory). Also, there is no indication that a Chinese admiralty court would treat Boskalis "unfairly." *See also Sinochem Int'l*, 549 U.S. at 432-36 (applying *forum non conveniens* doctrine in favor of a Chinese admiralty court).

We conclude that the district court did not abuse its substantial discretion in concluding that the District of South Carolina was not an appropriate forum in which to litigate the issues of liability and damages for a collision that occurred in China between ships owned by foreign corporations, particularly in view of its conclusion—which is supported by the record—that "[t]he United States has absolutely no connection to the events giving rise to this action."

We do, however, modify the district court's judgment to make it conditional on MSC Shipping's not raising or asserting a defense based on a statute of limitations or court-imposed deadline in response to any claim made by Boskalis against MSC Shipping in China. *See Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 968 n.6 (2d Cir. 1980) ("[I]t is advisable to make any dismissal conditional in nature").

V

The increasingly integrated markets served by global shipping cry for an increasingly coherent application of maritime

law for the resolution of maritime disputes. Just as maritime law grew dramatically during the Middle Ages with the new growth of international trade, to become a reasonably homogenous compilation of principles, so now maritime law demands refinement such that it becomes imbued in application with yet greater mutual respect of seafaring nations for each nation's application of maritime law. More than ever, parties need a system that responds predictably and fairly to maritime disputes arising from international shipping and trade. Thus, without hesitation, the Supreme Court deferred to the Guangzhou Admiralty Court in China to resolve a dispute over the legitimacy of a bill of lading that led to the arrest in China of a ship that carried steel coils from Philadelphia to China. Likewise, we readily affirm application of the doctrine of *forum non conveniens* in deference to the Tianjin Admiralty Court to resolve the liability and damages for a collision occurring in Chinese waters between ships of foreign nations when the Chinese authorities investigated the collision, the Chinese court arrested both ships involved to aid disposition of the claims made to that court, and no U.S. financial interests are directly implicated.

It will, at the same time, also become increasingly important to the U.S. justice system for district courts to exercise their jurisdiction with care when presented with suits between non-Americans over collisions that occur in foreign waters simply because the application of U.S. law is desired. U.S. courts should be ready to rely on their wide discretion and decline to exercise jurisdiction when doing so will avoid the danger of U.S. courts becoming a place for resolving a maritime dispute only because U.S. law might provide a more favorable outcome for one of the litigants. The circumstances of this case provide a prime example of when a U.S. court should show restraint. We accordingly affirm the judgment of the district court, subject to the condition we imposed in Part IV.

*AFFIRMED AS MODIFIED*

SHEDD, Circuit Judge, dissenting:

The district court granted MSC Shipping's motion to dismiss this action — an action which MSC Shipping commenced — under the federal common-law doctrine of *forum non conveniens*. After modifying the district court's judgment, the majority affirms. However, it is not clear that MSC Shipping could properly move to dismiss its own action on *forum non conveniens* grounds, but even if it could, the district court erred in granting MSC Shipping's motion because it did so without first concluding that an alternative forum was available at the time of its dismissal, which both Supreme Court and Fourth Circuit case law require. Accordingly, I dissent.

I

Under controlling precedent, a district court must make two findings before it can dismiss an action on *forum non conveniens* grounds. First, it must determine that an alternative forum exists at the time of its dismissal. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981); *Kontoulas v. A.H. Robins Co., Inc.*, 745 F.2d 312, 315-16 (4th Cir. 1984). Second, it must consider various public and private interest factors to determine whether to exercise its discretion and dismiss the action in favor of the alternative forum. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 505-09 (1947); *Kontoulas*, 745 F.2d at 315-16.[1]

---

[1]For an alternative forum to "exist" within the meaning of the *forum non conveniens* doctrine, a court must find that it is both available and adequate. *Kontoulas*, 745 F.2d at 315-16. Because I conclude that the district court erred by dismissing this action without first determining that an alternative forum is available, I do not reach the question of whether the alternative forum is adequate or whether the district court properly balanced the public and private interest factors.

II

A.

As an initial matter, I am not convinced it was proper for MSC Shipping to move to dismiss its own action on *forum non conveniens* grounds. There is a presumption that the forum chosen by the party that commenced the action is appropriate, and the *forum non conveniens* doctrine provides a mechanism by which the opposing party can overcome this presumption. *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *Gulf Oil*, 330 U.S. at 505-09. Indeed, courts developed this doctrine in response to the problem of a *plaintiff* choosing an inconvenient forum to "'vex,' 'harass,' or 'oppress' the defendant," *Gulf Oil*, 330 U.S. at 508, and the burdens and presumptions that apply in a *forum non conveniens* analysis are based on the fact that the party who chose the current forum is not the one moving to dismiss the action, *see Sinochem*, 549 U.S. at 430 ("A defendant invoking *forum non conveniens* ordinarily bears a heavy burden in opposing the plaintiff's chosen forum."). Indeed, I am unaware of any controlling authority that establishes a party's right to move to dismiss its own action on *forum non conveniens* grounds.

B.

To the extent the majority's decision to allow MSC Shipping to dismiss its own action on *forum non conveniens* grounds is influenced by its view that the equities in this case favor MSC Shipping, I am not persuaded that this view is correct. For instance, the majority concludes that MSC Shipping's conduct was consistent with one of the purposes of the U.S. Limitation of Liability Act because, after posting $111,348,810 in security with the district court as required by the Act and applicable rules, MSC Shipping used the Act to obtain an injunction against Boskalis before eventually moving to dismiss the action. *See Maj. Op.*, at 14-15. Simply

using the Act to obtain an injunction, however, does not make MSC Shipping's conduct consistent with the Act because MSC Shipping's conduct undercuts the more fundamental purpose of the Act, which is to allow a court to adjudicate claims against the full amount of the security posted. *See, e.g.*, *Maryland Cas. Co. v. Cushing*, 347 U.S. 409, 414 (1954). By moving to dismiss this action, MSC Shipping has effectively used the Act to artificially limit a claimant's available recovery to less than 20 percent of the full fund.[2]

The majority also asserts that MSC Shipping's only alternative to commencing this action was to appear in every Boskalis-initiated attachment proceeding and file motions to dismiss in each of those cases. Yet, MSC Shipping indicated during oral argument that it could have commenced a limitation proceeding in response to and in any *one* of Boskalis's pending attachment actions. Accordingly, MSC Shipping could have used one of those proceedings to obtain an injunction preventing Boskalis from commencing or continuing to litigate its other actions and then moved to dismiss the case in favor of the Chinese forum on *forum non conveniens* grounds. Not only would this course have served the interests of judicial economy, by preventing the need for the district court's proceedings below, it would have allowed MSC Shipping to move for a *forum non conveniens* dismissal from the traditional posture of the party who did not commence the action.

Furthermore, MSC Shipping only moved to dismiss this action in favor of the Chinese forum after the deadline for filing claims against MSC Shipping in that forum passed; and while the majority states that MSC Shipping asserted in its complaint that it would move to dismiss this action, *see Maj. Op.*, at 7 (citing MSC Shipping Compl. at ¶ 20), the majority

---

[2]As noted, MSC Shipping posted $111,348,810 in security with the district court, but posted only $20,000,000 (approximately) with the Tianjin Admiralty Court.

overstates the facts. MSC Shipping did not announce in its complaint that it would move to dismiss this action, it only reserved the right to do so. *See* MSC Shipping Compl. at ¶ 20. Therefore, if the equities are at all relevant to determining whether MSC Shipping could move to dismiss its own action on *forum non conveniens* grounds, they do not appear to favor MSC Shipping.

III

A.

Even assuming MSC Shipping could properly move to dismiss its own action on *forum non conveniens* grounds, the district court abused its discretion in granting MSC Shipping's motion because it did so without first concluding that an alternative forum was available at the time of its dismissal. *See United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007) ("A district court abuses its discretion when it . . . commits an error of law."). As noted above, both Supreme Court and Fourth Circuit precedents require a district court to determine that an alternative forum is available at the time of its decision before it can dismiss an action on *forum non conveniens* grounds. *Piper*, 454 U.S. at 254 n.22; *Kontoulas*, 745 F.2d at 315-16. Controlling case law also makes it clear that the party who moves for a dismissal on *forum non conveniens* grounds bears the "heavy burden of showing" that an alternative forum is available. *Kontoulas*, 745 F.2d at 316; *see also Sinochem*, 549 U.S. at 430 (stating that the defendant bears the "heavy burden"). As the majority acknowledges, an alternative forum is not available if, among other things, the statute of limitations in the alternative forum has expired. *Maj. Op.*, at 20; *see also Kontoulas*, 745 F.2d at 316.

Here, the parties dispute whether a statute of limitations or its equivalent rendered the Chinese forum unavailable at the time of the district court's ruling. According to Boskalis, the deadline for commencing or joining an action against MSC

Shipping in China passed on June 30, 2007, which was before the district court's decision. In response, MSC Shipping argues that China does not always follow filing deadlines and therefore *might* permit Boskalis to join or commence an action against it notwithstanding the expiration of the June 30 deadline. *See* Appellees' Br. 26. However, Chinese maritime procedure law and the notices issued by the Tianjin Maritime Court support Boskalis's position. *See* J.A. 105, 326, 333-34. Thus, on this record, MSC Shipping clearly has not carried its heavy burden of showing that the Chinese forum was available at the time of the district court's decision. Therefore, Supreme Court and Fourth Circuit case law provide that this case cannot be dismissed on *forum non conveniens* grounds. *See Piper*, 454 U.S. at 254 n.22; *see also Kontoulas*, 745 F.2d at 315-16.

However, the majority does not require MSC Shipping to meet its burden. Instead, after noting the parties' differing positions with respect to the availability of the Chinese forum, the majority simply states that it is "not clear whether a statute of limitations would have indeed barred Boskalis' claim against the limitation fund in China." *Maj. Op.*, at 21-22. In other words, the majority finds that it is not clear whether MSC Shipping has carried its burden of showing the availability of the Chinese forum. Nonetheless, the majority affirms the district court's decision by adopting an exception to the *forum non conveniens* doctrine, holding that an alternative forum does not need to be available in this case because Boskalis could have joined the Chinese proceeding before the June 30 deadline expired. I do not agree with the majority that we should adopt and apply such an exception because, as noted above, both Supreme Court and Fourth Circuit case law clearly require that an alternative forum be available before a case can be dismissed on *forum non conveniens* grounds. *See, e.g.*, *Piper*, 454 U.S. at 254 n.22; *see also Kontoulas*, 745 F.2d at 315-16. The majority's decision thus represents a dramatic change from current law.

In addition to being a required element of the *forum non conveniens* analysis, the availability requirement serves a vital purpose and thus should not be lightly discarded. The Supreme Court has repeatedly instructed that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996); *see also Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) ("[T]he federal courts have a virtually unflagging obligation to exercise their jurisdiction." (quotation marks omitted)). The *forum non conveniens* doctrine represents one of the narrow exceptions to this general requirement because it allows a court to dismiss an action even if, as here, subject matter jurisdiction is entirely proper. *See Gulf Oil*, 330 U.S. at 504. However, one of the reasons why we can use the *forum non conveniens* doctrine to dismiss an action — even when we have jurisdiction — is because the doctrine's availability requirement helps ensure that a tribunal in some alternative forum will be able to address the merits of the parties' dispute. *See id.* at 504-09; *cf. Burford v. Sun Oil Co.*, 319 U.S. 315, 332-34 (1943) (stating that a state court's concurrent jurisdiction counsels in favor of abstention). Indeed, "if no other forum is available . . . it would be exceedingly harsh to dismiss for forum non conveniens." *Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1248 (5th Cir. 1983).

## B.

To the extent some courts have created a "bad faith" exception to the availability requirement — under which a party's conduct can eliminate the requirement that an alternative forum be available — and to the extent there is a suggestion that Boskalis's past conduct places this case within that exception, there is nothing in the record to support such a view. Both United States and Chinese law provided Boskalis with options for attempting to recover losses associated with the collision, and Boskalis simply elected not to pursue a remedy in China. Similar decisions are made by litigants all the

time when they decide whether and where to commence an action, and this alone does not show any bad faith by Boskalis.

In any event, the three cases from other circuits that the majority cites in support of its exception to the availability requirement, *see Maj. Op.*, at 22-23, are inapposite. They all involve cases where courts have held or suggested that the past conduct of the party who *commenced* the action can be held against it in determining whether an alternative forum is available.[3] Thus, these three cases do not support considering Boskalis's conduct as a factor in deciding the *forum non conveniens* issue because Boskalis did not commence this action. It merely responded to a complaint filed by MSC Shipping in a forum of MSC Shipping's choosing.[4]

C.

Additionally, while the majority modifies the district court's judgment to make it conditional on MSC Shipping not "raising or asserting" a defense based on a statute of limitations, *Maj. Op.*, at 26, such a condition is not necessary under the majority's analysis.[5] If, as the majority holds, the alterna-

---

[3]While the *forum non conveniens* doctrine does not support considering Boskalis's conduct when determining the availability of an alternative forum, there is some support for considering the motives of the party that commences the action. As indicated above, courts developed the *forum non conveniens* doctrine as a way of responding to actions commenced by parties whose motives were to "'vex,' 'harass,' or 'oppress' the defendant," *Gulf Oil*, 330 U.S. at 508. Thus, since the doctrine is "sensitive to [a] *plaintiff's* motive for choosing his forum," *Veba-Chemie*, 711 F.2d at 1248 n.10 (emphasis added), there is a basis for considering MSC Shipping's motives because it commenced this action.

[4]Notably, the three cases the majority cites all involve application of the *forum non conveniens* doctrine in the traditional procedural setting — *i.e.*, where the defendant moves to dismiss an action that another party commenced — thus lending support for my position.

[5]In *Kontoulas*, we did not reach the question of whether "conditional dismissals" "were proper under the common law *forum non conveniens*

tive forum does not need to be available, then this condition simply serves as a salve to soften the harshness of the majority's new rule.

Moreover, Boskalis can take little comfort in this condition because MSC Shipping itself has stated that "it is not a matter for the parties to waive or extend the deadline for a claimant to file a claim in a Chinese limitation action. Instead, the decision lies within the discretion of the Tianjin Admiralty Court." Appellees' Br. 50 (citation omitted). Consequently, regardless of whether MSC Shipping "raise[s] or assert[s]" the deadline as a defense, Boskalis may be unable to proceed against MSC Shipping in China. If anything, the majority should condition the dismissal on the June 30 deadline not preventing Boskalis from commencing or joining an action against MSC Shipping. However, this condition should not be imposed unless MSC Shipping first carries its burden of showing that the alternative forum was available. *See Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 969 n.6 (2d Cir. 1980) ("[E]ven when the district court 'justifiably believes' that there is an adequate alternative forum, it is advisable to make any dismissal conditional in nature when there is uncertainty or conflict between expert opinions with regard to foreign jurisdictional law.").

## IV

For the foregoing reasons, I dissent.

---

doctrine," and we stated that the moving party in that case "cited no authority for such a conditional dismissal." *Kontoulas*, 745 F.2d at 316 n.10. I am not aware of any controlling authority since *Kontoulas* that authorizes our use of conditional dismissals in this context.